**TRANDES CORPORATION**

v.

**GUY F. ATKINSON COMPANY et. al.**

Civ. No. Y-91-1698.

United States District Court,
D. Maryland.

Aug. 14, 1992.

---

Richard Murray, and Christian D. Abel, Washington, D.C., for plaintiff.

Thomas B. Dorrier, Robert J. Kniaz, Washington, D.C., for defendant Washington Metropolitan Area Transit Authority.

Richard A. Ifft, John G. DeGooyer, Ronald A. Uitz, Washington, D.C., for defendant Guy F. Atkinson Co.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

A three day jury trial in this case was concluded on March 25, 1992. Defendant Washington Metropolitan Area Transit Authority ("WMATA") was found guilty of breach of contract, breach of fiduciary duty, and misappropriation of trade secrets. Defendant Guy F. Atkinson Company ("Atkinson") was found guilty of misappropriation of trade secrets. The jury awarded damages in the amount of $17,400 compensatory and $750,000 punitive.

Atkinson has filed a motion for judgment as a matter of law claiming that the alleged "misappropriated software", was not a "trade secret," thus plaintiff's claim is insufficient as a matter of law.[1] WMATA has filed a motion for remittitur of the compensatory damage award, and Trandes has filed a motion to amend the complaint to conform to the evidence.

## FACTS

Trandes is the owner of a certain set of computer programs aimed at solving commonly encountered problems in the design and construction of rapid transit systems. These programs are arranged in "modules", and the modules are grouped together to form a system, known as the "Tunnel System." The Tunnel System is comprised of six modules, each of which is useful in a different area of tunnel construction. The computer programs comprising each of the modules are written in "object" or "machine" code, and are unintelligible unless used with computers.

The Tunnel System software receives input from data files that are designed specifically for the Tunnel System and are not useful for any purpose other than as a common database for the various modules of the System.

At trial, James Brusse, president of Trandes and creator of the Tunnel System software, testified that Trandes does not ordinarily license the use of its software, but instead will perform Tunnel System services for its clients and provide them with the results. In November of 1987, however, Trandes issued a license to WMATA to use the Tunnel System software. The licensing agreement placed strict requirements on use and dissemination of the software. WMATA was authorized to:

> [u]se [the System] for [its] own construction or engineering projects.... make archival copies for the sole purpose of backing-up [the] software and protecting [its] investment from loss.... [a]llow [its] contractor to operate any module only if it is used for [Trandes'] projects and then *only with the expressed written approval of Trandes* of each contractor. (emphasis supplied).

The licensing agreement further provided that each of WMATA's contractors

---

1. Atkinson also contends that plaintiff's exclusive remedy in this case is under the Copyright Act, 17 U.S.C. § 301 et seq. Section 411 of the Copyright Act provides that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made." This case was commenced on June 19, 1991. Plaintiff registered for copyright protection on January 21, 1992. Thus, the Copyright Act does not govern the issues in this case.

would be required to sign similar licensing agreements, "prior to operat[ing]" the System. The contractor's license would end when the contractor ceased doing business with WMATA.

Between 1988 and 1990, WMATA contracted with Atkinson to construct a section of the Washington Metro Green Line (the "Green Line Project"). An engineer employed by WMATA at the time of the Project, testified that a copy of the Tunnel System was kept in a trailer at the construction site and was available for use by anyone entering WMATA's trailer. Several witnesses testified that WMATA employees provided Atkinson employees with a users' manual, "Input Data Files", the Tunnel System password, and instruction on how to gain access to and use the System.

Anthony Ciaffoni, a field engineer employed by Atkinson testified that he was introduced to the Tunnel System software at the work site by his supervisor Robert Hultsman. Hultsman assured him that there was a licensing agreement between Atkinson and Trandes "somewhere," but alluded to possible impropriety, and cautioned him not to publicize the fact that the software was being used.

Ciaffoni worked for Atkinson on the Green Line Project from June, 1989 to August, 1991. Before leaving, he trained his replacement, Robert White, on software and discussed with White his belief that the software was being used without a license. White testified that Hultsman later offered him a copy of the software saying that "every company needed one." Atkinson employee Mamo Meaza testified that the software was in use when he began work with Atkinson in August, 1989. Finally, there was evidence of a Tunnel System manual and printouts found in Atkinson's possession, on which the name WMATA as authorized user, had been whited out and replaced with the name Atkinson.

The Jury found that WMATA breached the terms of its licensing agreement by permitting the Tunnel System modules to be used by Atkinson employees; that Atkinson misappropriated the trade secrets of Trandes by acquiring the Tunnel System and using it without authorization, and that Atkinson acted willfully, wantonly and maliciously.

## TRADE SECRETS

In the current motion, Atkinson does not dispute that its employees used the Tunnel System software and Input Data Files without WMATA's consent. Atkinson contends that as a matter of law, the Tunnel System programs do not contain trade secret information, because (1) the computer programs comprising the modules of the system are written in "object code," and are unintelligible to even the most experienced computer hacker, and (2) Trandes has advertised and marketed the programs world wide.

■ On a motion for judgment as a matter of law, the movant is entitled to judgment if there can be but one reasonable conclusion as to the verdict. Fed.R.Civ.P. 50. *See e.g., Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir. 1980). Unlike on a motion for summary judgment, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Gairola v. Virginia Dept. of Gen. Services,* 753 F.2d 1281, 1285 (4th Cir.1985). When considering the motion, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 243 n. 14 (4th Cir.1982); *Tights, Inc. v. Acme–McCrary Corp.,* 541 F.2d 1047, 1055 (4th Cir.), *cert. den.* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

■ A trade secret is defined as:
any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Space Aero Products Co. v. R.E. Darling Co.*, 238 Md. 93, 208 A.2d 74 (1965).[2]

Atkinson argues that the "secrets" of the Tunnel System are not readily ascertainable, because the programs comprising each module are written in "object code," a computer language that is unintelligible to human beings. Courts have routinely held that such things as computer programs, and user reference manuals constitute protectable trade secrets. *See e.g. ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1333 (N.D.Ill.1990) and cases cited therein. The fact that the computer programs comprising the modules of the Tunnel System were written in object code, does not change the character of this software as a trade secret. There was sufficient evidence on which the jury could reasonably find that while the components of the Tunnel System, i.e. the modules and the computer programs comprising each module, were written in object code and unintelligible to the average user, the design, use and interrelationship of these components was original and provided Trandes with a competitive advantage in the rapid transit industry. *See e.g., ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1333–34 (N.D.Ill.1990); *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 377 (S.D.N.Y.1989) ("[P]laintiffs have met their burden of demonstrating that the combination of the several modules, as well as the specific source code of each individual module, constitute[s] a trade secret...."); *O–Co. Industries, Inc. v. Hoffman*, 625 F.Supp. 608 (S.D.N.Y.1985) ("It is a well settled principle 'that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" [cite omitted]).

The evidence shows that, except through improper means, the Tunnel System trade secrets were not generally known. Brusse testified that in general Trandes performs Tunnel System services for its customers, and provides the "results." Trandes repeatedly rejected WMATA's attempts to purchase the Tunnel System source code, and licensed the System under the strict requirement that WMATA obtain Trandes' written approval before permitting the software to be used by an outside contractor. The language of the Licensing Agreement clearly reflects Trandes' intention to keep the System confidential.

There was evidence that Trandes advertised its Tunnel System program for sale to contractors in an engineering trade journal, offered "demonstration diskettes" to potential buyers, and sold "one Tunnel System module" to a tunnel contractor other than WMATA. Atkinson contends that this evidence destroys any secrecy, and reflects an intent not to keep the software confidential. The trade secret at issue in this case is not destroyed by the offer of certain modules for sale. As noted earlier, the "secret" is the combination and interrelationship of the six modules provided to WMATA, and the format of the Input Data Files used to run the System. The limited sale of "demonstration diskettes" that may or may not contain the same combination of modules, programs or functions that were provided to WMATA under the Licensing Agreement, and the sale of 'one module' to another entity is insufficient to controvert the preponderance of evidence indicating that the software licensed to WMATA was intended to be kept confidential. Atkinson's motion for judgment as a matter of law will be denied.

## REMITTITUR

1. Punitive Damages

■ Atkinson contends that punitive damages should not be assessed in this

---

**2.** As will be discussed *infra.*, Maryland Common Law provides the rule of law in this case. The Court takes note however, that the Maryland Uniform Trade Secrets Act provides a similar definition for trade secret:

> information, including a formula, pattern, compilation, program, device, method, tech-

nique, or process, that ... [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use....

Md. [CL] Cd.Ann. § 11–1201 (1990).

case because Trandes has not met its burden of proving by clear and convincing evidence that Atkinson acted willfully and maliciously. *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992). The evidence shows that Atkinson acquired the Tunnel System Software, that several of Atkinson's employees including Hultsman, Ciaffoni and White, knew or suspected that the software was being used without a license, and that a Tunnel System Manual and printouts were found in Atkinson's possession with the name Atkinson substituted for WMATA as the authorized user. Based on these facts, a jury could reasonably find by clear and convincing evidence that Atkinson acquired and used the Tunnel System software intentionally and without legal justification or excuse. *See e.g., GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.*, 27 Md.App. 172, 340 A.2d 736 (1975).

Atkinson argues in the alternative that the jury award of punitive damages was excessive and contrary to law. Under the Maryland Uniform Trade Secrets Act ("MUTSA"), the issue of punitive damages is a matter for Court discretion, and an award of punitive damages may not exceed twice the award of compensatory damages. MD. [CL] Cd.Ann. § 11–1201 (1990). Atkinson contends that the Court erred by submitting the issue of punitive damages to the jury, and that the award of punitive damages exceeds the limitations imposed by the MUTSA. As will be discussed below, the MUTSA does not apply to this case, and the issue of punitive damages was properly submitted to the jury.

■ At the outset, however, the Court notes that defendants failed to make a timely objection at trial to the instructions and special verdict form submitted to the jury. Fed.R.Civ.P. 49 and 51. Federal Rule of Civil Procedure 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to

consider its verdict." Fed.R.Civ.P. 51. *Richmond, Va. v. Madison Management Group, Inc.*, 918 F.2d 438, 454 (4th Cir. 1990); *Sandberg v. Virginia Bankshares, Inc.*, 891 F.2d 1112, 1122 (4th Cir.1989), *rev'd* on other grounds, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). The failure to object provides an independent ground to reject Atkinson's argument.

■ Atkinson contends that the jury award does not comply with the Maryland Uniform Trade Secrets Act, because the award exceeds the limitation on punitive damages imposed by the Act. MD. [CL] Cd.Ann. § 11–1203 (1990). Plaintiffs respond that the MUTSA does not apply because the misappropriation at issue began prior to July 1, 1989, the effective date of the Act.[3] Plaintiffs have also filed a motion to amend the Complaint to plead a cause of action for misappropriation of trade secrets under Maryland common law.

The evidence supports a finding that the misappropriation of the Tunnel System software was a continuing misappropriation that began prior to July 1, 1989. WMATA purchased the right to use the software in November, 1987. Atkinson began work with WMATA on the Green Line project in late 1988. A WMATA employee testified that a copy of the Tunnel System was kept in a trailer at the construction site and was available for use by anyone entering WMATA's trailer.

Ciaffoni began work with Atkinson as a field engineer in June, 1989. He testified that he was introduced to the Tunnel System by his supervisor, Robert Hultsman. Meaza, another Atkinson employee, testified that the software was in use when he began work in August, 1989.

In response to Trandes' first round of interrogatories Atkinson states, "[f]rom March 1989 or earlier to the present, Tunnel System reports generated by Atkinson or provided to Atkinson by WMATA and others have been used by Robert Hultsman, Tony Ciaffoni, Robert White ..." and

---

**3.** The MUTSA is codified at § 11–1201 *et seq.*, Md.Code [CL] Ann. (Ch. 598, Acts 1989.) Pursuant to section 2 of ch. 598, Acts 1989, the Act does not apply to misappropriations that occur

prior to the effective date of the act, or continuing misappropriations that begin prior to that date.

others. Based on these facts, and in accordance with Federal Rule of Civil Procedure 49, the Court finds that the continuing misappropriation at issue began prior to July 1, 1989, thus the MUTSA does not apply.[4]

Under Maryland common law, the issue of punitive damages is generally a matter for the jury. *Derby v. Jenkins*, 32 Md.App. 386, 363 A.2d 967 (1976). Once an award of punitive damages has been made, the Court's function is to insure that the award complies with applicable law. *Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1348 (4th Cir.1991). There need be no relationship between the amount of compensatory damages and the amount of punitive damages awarded. *D.C. Transit System, Inc. v. Brooks*, 264 Md. 578, 287 A.2d 251 (1972).

Punitive damages are awarded upon a showing that the defendants acted with malice, actual or implied, or with conscious disregard for the rights of others. *Gai Audio of New York, Inc. v. Columbia Broadcasting System, Inc., supra, H & R Block, Inc. v. Glenn B. Testerman*, 275 Md. 36, 338 A.2d 48 (1975) (holding that tortious conduct that is accompanied by either a deliberate intention to violate the rights of others or by a reckless disregard of the rights of others constitutes actual malice or its legal equivalent.) *Seigman v. Equitable Trust Co.*, 267 Md. 309, 315, 297 A.2d 758 (1972) On the record before the Court, there is little doubt that Atkinson obtained and used the Tunnel System, with knowledge both actual and constructive that Atkinson was not an authorized user. Atkinson's motion for remittitur of the punitive damages award will be denied.

### 2. Compensatory Damages

Defendant WMATA has filed a motion for remittitur of the compensatory damages award. A compensatory damage award will not be set aside on grounds of excessiveness unless it is against the clear weight of the evidence, is the product of erroneously admitted evidence, or will result in a miscarriage of justice. *Johnson v.*

*Hugo's Skateway*, 949 F.2d 1338, 1347 (4th Cir.1991). The jury awarded $17,400 in compensatory damages. WMATA suggests that this figure was arrived at by multiplying $2,900 (cost per Tunnel System module) by six. WMATA argues that the first of the six modules comprising the Tunnel System, is a module "typically" provided by Trandes at no charge, and should not have been included in the jury's calculations.

The evidence adduced at trial shows that WMATA purchased six modules at a cost of $2,900 per module for a total cost of 14,500 (five modules), with the sixth one provided free. The evidence does not indicate, however, that the sixth module was "typically" provided at no charge as WMATA was the first and only purchaser of the Tunnel System software. Based on this evidence, the jury could reasonably return a verdict for Trandes. *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980). Accordingly, WMATA's motion for remittitur of the compensatory damage award will be denied.

### MOTION TO AMEND

Trandes seeks to amend its complaint to plead a cause of action under the Uniform Trade Secrets Act, and common law. Plaintiff contends that the Maryland Uniform Trade Secrets Act does not apply to the facts of this case because the misappropriation at issue occurred before July 1, 1989, the effective date of the MUTSA. Rule 15(b), Fed.R.Civ.P. provides that a district court shall allow a post-trial motion to amend if the issues not raised in the pleadings have been tried by the parties' "express or implied consent." Fed.R.Civ.P. 15(b). *See also, Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1043–1044 (4th Cir.1986). For reasons set forth in more detail above, plaintiffs' motion to amend will be granted.

---

**4.** When a party fails to object to the contents of a special verdict form, the Court may decide any issues omitted from the form, in accordance with the judgment on the special verdict. Fed.R.Civ.P. 49.